**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 25, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

P.J. SHYERS, Special Administrator of the
Estate of Michael Turner,

     Plaintiff - Appellant,

v.

METROPOLITAN PROPERTY &
CASUALTY INSURANCE COMPANY,
d/b/a MetLife Auto & Home Business
Insurance; JOHN M. BROWN
INSURANCE INCORPORATED, d/b/a
Farmer Brown Insurance Agency, Inc.,

     Defendants - Appellees.

No. 24-5036
(D.C. No. 4:18-CV-00653-JWB-JFJ)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **MURPHY**, and **CARSON**, Circuit Judges.
_____

Plaintiffs generally cannot defeat summary-judgment motions by relying on

facts obtained during discovery distinct from their complaints' factual theories.  Due

process requires plaintiffs either hone their complaints' factual allegations in

discovery or amend them should facts supporting new factual theories for a claim

arise.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Michael Turner purchased replacement insurance coverage for his commercial building.  He claims the insurance agent told him his policy covered the total cost it would take to replace any damage the building might suffer.  He did not read the final insurance policy, which limited replacement coverage to $100,000.  When the building burned down, Turner discovered the coverage limit.  Purportedly believing insurance company MetLife and its agents misled him, he sued to reform the insurance policy to what he recalled the insurance company represented to him and claimed the insurance company both defrauded him and acted in bad faith by writing the contract as it did.  The district court granted Defendants summary judgment on all counts.  Our jurisdiction arises under 28 U.S.C. § 1291.  We affirm.

I.

Plaintiff Michael Turner operated a heating, ventilation, and air conditioning business.[1]  He purchased a commercial building in Afton, Oklahoma out of which he ran the business.  He bought it for $50,000 and spent another $50,000 renovating the dilapidated building.  Prior to commencing work, he inquired at the Farmer Brown Insurance Agency ("Farmer Brown") about a policy covering the building.  Plaintiff claims he told Farmer Brown's insurance agent he wanted "coverage to actually replace [his] property in the event of a total loss."  He paid $100,000 for renovations, and he says Farmer Brown's agent got him an insurance policy that reflected that amount.  Plaintiff inquired whether the policy limited any insurance recovery to that

---

[1] As explained below, P.J. Shyers later replaced Turner as named plaintiff.  For simplicity, this opinion refers to both as Plaintiff.

valuation. The Farmer Brown agent assured him it "did not represent the benefits [he] would be entitled to in the event of a loss and that [he] would be entitled to the actual value of the cost to replace the building." Plaintiff skimmed the policy without reading it in depth and purchased it.

Whatever discussions Plaintiff had with Farmer Brown's agent, the insurance policy Metropolitan Property & Casualty Insurance Company ("MetLife") issued gave Plaintiff building-replacement-cost coverage clearly limited to $100,000.[2] Recorded calls between Farmer Brown's agent and Plaintiff prior to the latter signing the policy contain no reference to unlimited replacement-cost coverage insurance, and MetLife did not offer such policies.

Plaintiff's building burned down. He filed a claim under his policy, and MetLife retained Sedgwick Claims Management Services ("Sedgwick") to investigate the replacement cost. Sedgwick estimated the replacement cost would be $336,966.75, an amount far exceeding Turner's policy's $100,000 limit. MetLife paid $59,949.61 under the policy's other provisions, including $2,319.30 in business-income-loss coverage, and $100,000 in replacement coverage, but Plaintiff contested the $100,000 replacement-coverage limits and MetLife's business-income-loss calculations. Calling Farmer Brown's agent, he said he could not replace his building for $100,000, after which the following conversation occurred:

> MS. DOSSA: Uh-huh. Well the – did you – have you been speaking to the adjuster about the – because the property is on replacement cost. So if–

---

[2] MetLife, a national insurance company, employed Farmer Brown as a local agent.

3

> MR. TURNER: Really?
>
> MS. DOSSA: Yes, so if it–that means that if it takes more money for the property to be replaced, then they should be able to cover it.
>
> MR. TURNER: The property, meaning the–
>
> MS. DOSSA: The actual structure.
>
> MR. TURNER: –building? You're kidding?
>
> MS. DOSSA: Yes.
>
> MR. TURNER: Seriously?
>
> MS. DOSSA: Yeah. Yeah, they should. If that's something that they–
>
> MR. TURNER: All they paid – all they paid was the base value.
>
> MS. DOSSA: That's something that the claim adjuster should know. That the policy is on replacement cost. . .

Plaintiff declared he "didn't know if we had replacement coverage," and that it was "fantastic actually because [he] was thinking [he] was going to have to borrow the money" to replace the building.

His excitement soon evaporated. Only after the phone conversation with Farmer Brown's agent did MetLife's insurance adjuster tell Plaintiff of the policy's $100,000 replacement coverage limit. Plaintiff called the agent again, who claimed ignorance. Feeling MetLife owed him replacement coverage for the full amount Sedgwick estimated and that both MetLife and Farmer Brown had misled him about the policy's contents, Plaintiff sued.[3] He alleged negligence against Farmer Brown and both breach of contract and bad faith against MetLife, seeking to reform the contract to meet what he believed were the original terms.[4]

---

[3] Plaintiff originally sued in state court, but the defendants later removed the case to the United States District Court for the Northern District of Oklahoma.

[4] Plaintiff brought a negligence claim against Sedgwick and its predecessor company Vericlaim, Inc., but the parties later settled that claim. We dismiss that claim pursuant to Federal Rule of Appellate Procedure 42(b)(1). Plaintiff also sought

4

The district court granted MetLife and Farmer Brown's motions for summary judgment. The court determined Plaintiff's reformation claim could not succeed because he did not show any prior agreement existed between him and either Farmer Brown or MetLife regarding replacement-cost coverage. He could not, therefore, reform the insurance contract, and his contract-breach claim failed as a matter of law for replacement-cost coverage. Plaintiff further alleged a contract-breach claim based on unpaid business-income loss under the policy, which the district court also dismissed. In the court's view, Plaintiff made "no effort in his analysis to show that [MetLife] breached the policy by failing to pay a certain amount for the business-interruption claim" because he did not cite record evidence that contradicted MetLife's business-loss calculations. Plaintiff also had not properly pled, the district court found, any other contract-breach claims based on the contract's other coverages.

The district court then dismissed Plaintiff's bad-faith claim because he based it almost exclusively on his reformed version of the contract that the district court already found inadequately pled. As for other indicia, Plaintiff showed only that MetLife waited to disburse certain insurance funds until he turned in several relevant financial records. This did not, the court reasoned, evidence bad faith. The district court lastly dismissed Plaintiff's negligence claim, which he argued was not a negligence claim at all, but instead was actually a fraud claim. The district court

---

punitive damages against all defendants, but does not appeal the district court's order denying them.

disagreed, citing most prominently that the amended complaint said "COUNT 1 – NEGLIGENCE AGAINST FARMER BROWN."  Plaintiff waived any negligence claim he might have had by disavowing his negligence claim and shifting his argument toward a claim for fraud.  The district court denied Plaintiff's request to amend his complaint again, noting that he made no motion to do so and that "the action had been proceeding for years and discovery was closed."

Plaintiff died four months before the district court entered judgment against him.  Although unaware that their client had passed, his lawyers appealed.  We later granted his estate's motion to substitute his estate's administrator, P.J. Shyers, as named plaintiff.

## II.

MetLife argues we lack jurisdiction because Turner's lawyers did not initially name Shyers or themselves as a party when they appealed, doing so only later when they moved to substitute.  In Metlife's view, Federal Rule of Appellate Procedure 3(c) requires appeal notices to "specify the party or parties taking the appeal by naming each one in the caption or body of the notice," and that this is a jurisdictional requirement.  "The Notice of Appeal," it argues, "does not name a personal representative of Turner or Turner's attorney as the Appellant," and it is therefore not "objectively clear from the face of the Notice of Appeal that a personal representative of, or attorney for, Turner intended to appeal on behalf of Turner."  According to MetLife, because Turner died before he could appeal, his attorney should either have "(a) secured and named a personal representative as the appellant or (b) named

6

himself as the appellant or plainly stated in the Notice of Appeal that he was appealing on behalf of his deceased client." The attorney's failure to do so, MetLife contends, divests us of jurisdiction.

We disagree. Federal Rule of Appellate Procedure 3(c)(7) states that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." MetLife tries to do just that. Turner's Notice of Appeal clearly named the relevant parties for which legal decisions it sought review. The notice set forth almost all relevant information except for the fact that Turner himself had died, an incidental fact that does not undermine that the "intent to appeal is otherwise clear." Fed. R. App. P. 3(c)(7).

Federal Rule of Appellate Procedure 43(a)(2) also specifies that "[i]f a party entitled to appeal dies before filing a notice of appeal, the decedent's personal representative—or, if there is no personal representative, the decedent's attorney of record—may file a notice of appeal within the time prescribed by these rules."[5] Rule 43(a)(1), in turn, places no limit on when a personal representative or attorney must move to substitute. Fed. R. App. P. 43(a)(1). Addressing almost this exact issue, we explained that this "court is not divested of jurisdiction where a party has died prior

---

[5] MetLife interprets this rule to require either the decedent's personal representative or the decedent's attorney name themselves as party in the decedent's stead in any notice of appeal. It contends Plaintiff's attorney's failure to do so therefore also divested this Court of jurisdiction. Rule 43(a)(2) has no such requirement, and means only the decedent's personal representative or attorney may file the notice of appeal.

to entry of judgment in the district court but substitution was not requested in the district court." Estate of Slade v. U.S. Postal Serv., 952 F.2d 357, 360 (10th Cir. 1991). In Slade, we granted a motion to substitute filed more than four months after a notice of appeal. Id. at 359–60. We see no reason to do otherwise here.

III.

We review de novo district courts' summary-judgment grants, applying the same standard as the district court. Hamric v. Wilderness Expeditions, Inc., 6 F.4th 1108, 1121 (10th Cir. 2021) (citing Universal Underwriters Ins. Co. v. Winton, 818 F.3d 1103, 1105 (10th Cir. 2016)). We grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, we grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In so doing, we construe all reasonable factual inferences in Plaintiff's favor. Water Pik, Inc. v. Med-Sys., Inc., 726 F.3d 1136, 1143 (10th Cir. 2013) (citing Sally Beauty Co., Inc. v. Beautyco, Inc., 304 F.3d 964, 971–72 (10th Cir. 2002)). Like the district court, we apply substantive Oklahoma law. See Cohen-Esrey Real Est. Servs., Inc. v. Twin City Fire Ins. Co., 636 F.3d 1300, 1302 (10th Cir. 2011) (stating that courts proceeding in diversity apply the substantive law of the state in which they sit). We review the district court's denial of Plaintiff's request to amend his complaint for abuse of discretion. Young v. Colorado Dep't of Corr., 94 F.4th 1242, 1249 (10th

8

Cir. 2024) (citing SCO Grp., Inc. v. International Bus. Machines Corp., 879 F.3d 1062, 1085 (10th Cir. 2018)).

IV.

Plaintiff challenges the district court's rejection of his reformation claims, his purported fraud claims against Farmer Brown, and his bad-faith and breach-of-contract claims against MetLife.  Most of Plaintiff's claims turn on the reformation claim.  So we address it first.

A.

Plaintiff claims the district court "incorrectly posited that [his] reformation claim [sought] replacement coverage" rather than "full-replacement coverage for his building."  He maintains disputed facts exist as to whether the parties agreed to full-replacement coverage when he bought the insurance policy, pointing primarily to his own declaration stating that Farmer Brown's agent represented to him that "the policy covered the full actual cost to rebuild [his] commercial building."  He argues that Farmer Brown committed constructive fraud, and emphasizes that "[b]ecause fraud, by its nature, is very difficult to prove by direct evidence, it is most often proved by circumstantial evidence."  Plaintiff contends he relied on Farmer Brown's agent's false representation to his detriment, and the district court should have permitted him to reform his insurance policy on that basis.

Parties to Oklahoma contracts can reform them only with "proof of the contract to be reformed and proof, by clear and convincing evidence, of a mutual mistake or mistake by one party and inequitable conduct on the part of the other that

9

resulted in a written contract that did not reflect the parties' intent." Oklahoma Oncology & Hematology P.C. v. U.S. Oncology, Inc., 160 P.3d 936, 947 n.22 (Okla. 2007) (citing Thompson v. Estate of H.H. Coffield, 894 P.2d 1065, 1067 (Okla. 1995)). Plaintiff compares his case to Gentry v. American Motorist Insurance Co., in which Oklahoma's Supreme Court reformed a contract after an insurance agent falsely represented to a real estate developer that a risk policy covering theft included theft by employees and subcontractors. 867 P.2d 468, 470 (Okla. 1994). When such a theft occurred, the insured filed a claim the insurance company denied because the policy excepted employee and subcontractor thefts. Id. The Oklahoma Supreme Court upheld the district court's reformation because the insurer engaged in constructive fraud through its false representation. Id. at 472. Plaintiff argues he too is a fraud victim, and that the district court erred by rejecting his effort to reform the policy.

But Plaintiff fails to demonstrate either a prior contract or any fraud based on evidence from which a reasonable jury could find for him by clear and convincing evidence. Plaintiff's appellate brief contains no record citations that support his characterization of his interactions with Farmer Brown's agent. Even when he provides specific record citations in his reply, he mostly cites to his own declaration telling his recollection of how he got his replacement coverage policy. The only other part of the record to which he cites is an email from Farmer Brown's agent that reads "I confirmed the property is covered under replacement cost so go ahead and get the plans and send them to the adjuster or to me and I will forward. I am waiting

10

to hear back about that possible extra coverage."  The email, which post-dates

Plaintiff purchasing the insurance policy, mentions neither full-replacement coverage

nor that Plaintiff ever discussed getting full-replacement coverage with Farmer

Brown's agent.[6]

Plaintiff built his summary-judgment case mostly on his self-serving

declaration.  In some contexts, "[e]ven standing alone, self-serving testimony can

suffice to prevent summary judgment."  Greer v. City of Wichita, Kansas, 943 F.3d

1320, 1325 (10th Cir. 2019) (citing Evers v. Regents of Univ. of Colo., 509 F.3d

1304, 1309 (10th Cir. 2007)).  But "because at summary judgment we are beyond the

pleading phase of the litigation, [the non-movant]'s version of the facts must find

support in the record."  Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1312 (10th Cir.

2009).  And "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts."  York v. City of Las Cruces, 523

---

[6] MetLife claims Plaintiff's amended complaint fails to state a reformation claim because it seeks to reform the contract "to provide 'replacement cost rather than actual cash value' coverage of the Building."  As the insurance policy has replacement coverage, albeit limited to $100,000, MetLife argues there can be no reformation and that Plaintiff therefore failed to state a claim.  But construing the pleadings liberally, Plaintiff did state a reformation claim.  The amended complaint says that "[a]t the time of agreement Metlife's agent assured Plaintiff that the policy he purchased contained replacement cost coverage," which he seems to have understood to mean providing the funds necessary to completely fix his building regardless of the amount.  To this end, he pleads that "[a]s a result of all of the work on the building, it was worth well over $100,000.00 when it was completely lost."  As a result, he pleads sufficiently that he purchased coverage for a cost higher than the $100,000 replacement coverage limit the final policy contained.

F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). This is especially true in cases where the party with only self-serving testimony bears the burden of proving his case by clear and convincing evidence, because under that standard he bears the heavy burden of showing that the fact he seeks to prove is "highly probable." United States v. Dear, 104 F.4th 145, 147 (10th Cir. 2024) (quoting Florida v. Georgia, 592 U.S. 433, 438–39 (2021)). Indeed, under the clear and convincing evidence standard, the party's evidence must leave us with "'a firm belief or conviction, without hesitancy,' of the truth of the matter asserted." United States v. Antone, 742 F.3d 151, 169 (4th Cir. 2014) (quoting United States v. Springer, 715 F.3d 535, 538 (4th Cir. 2013)).

Here, Plaintiff could reform the contract if his evidence demonstrated, with high probability and left us firmly convinced, "without hesitancy," that his version of the story—namely, that he specifically asked for full-replacement coverage and Farmer Brown's agent represented that his policy would have it—is correct. Gentry, 867 P.2d at 472; Antone, 742 F.3d at 169. But he references no record evidence showing that this was the case besides his own declaration. And the record strongly supports the opposite conclusion. As the district court noted, "the recorded calls [in the record] reveal that Plaintiff was surprised and elated at the thought that he could recover more money for his building in the calls with [Farmer Brown's agent] after the fire." In one recorded call, Farmer Brown's agent stated that "if it takes more money for the property to be replaced, then they should be able to cover it," to which Plaintiff said with surprise "You're kidding . . . Seriously?" and observed that he

12

"didn't know if [h]e had replacement coverage." These calls, made months after he obtained the policy, suggest Plaintiff never expected his insurance to cover the full cost to replace his building if it ever burned down until after the fire. Plaintiff's ex-post-facto expectation contradicts his claim that he sought, and thought he received, full-replacement coverage when he bought his insurance policy from MetLife. Though Plaintiff's contradictory testimony could possibly create an issue of fact where the burden of proof was a mere preponderance of the evidence, it cannot defeat summary judgment in this case, where Plaintiff bore the burden of proving his case by clear and convincing evidence. See McCoy v. Meyers, 887 F.3d 1034, 1044 (10th Cir. 2018) (quoting Patel v. Hall, 849 F.3d 970, 978 (10th Cir. 2017)).

But even if his self-serving declaration could defeat summary judgment (which, we conclude it could not), Turner's death presents a crucial issue relevant for the first time on appeal: his case has no evidence admissible for trial. As indicated above, the only evidence that supports Turner's recollection that he asked Farmer Brown for full-replacement coverage is his self-contradicting declaration that he attached in response to Farmer Brown's summary-judgment motion. Even if we assume Plaintiff's declaration could show "by clear and convincing evidence, a mutual mistake or mistake by one party and inequitable conduct on the part of the other that resulted in a written contract that did not reflect the parties' intent," Oklahoma Oncology & Hematology, 160 P.3d at 947 n.22 (citing Salt Lake Cnty., 894 P.2d at 1067), the declaration could defeat summary judgment only if the testimony it contained would be admissible at trial, Universitas Educ., LLC v. Avon

13

Cap., LLC, 124 F.4th 1231, 1247 (10th Cir. 2024) (quoting Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005)).

As Farmer Brown points out, though, "[t]he declaration . . . is not admissible into evidence."[7] Farmer Brown is correct–Declarations like Turner's—made out-of-court to defeat summary judgment—are hearsay, and normally inadmissible because they not are not subject to an oath, personal presence in court, and cross-examination. Fed. R. Evid. 804(b)(1)(A–B); see also United States v. Console, 13 F.3d 641, 656 (3d Cir. 1993). Relevant portions of Turner's declaration are also hearsay within hearsay because Turner described in the declaration representations Farmer Brown's agent allegedly made to him about the scope of the replacement-coverage insurance he purchased. Turner would likely have testified to the declaration's contents at trial where Farmer Brown could have cross-examined him, but his death precludes that possibility.[8]

---

[7] Tellingly, Plaintiff never disputes this observation. He comes closest in his reply brief, in which he defends against Farmer Brown's argument by arguing that it "did not object to or move to strike Mr. Turner's declaration in its summary judgment pleadings. As such, any argument regarding the declaration's admissibility is waived and it is properly considered as evidence on summary judgment." Plaintiff were correct, the evidence would still be inadmissible at trial even if Farmer Brown never moved to strike Turner's declaration in its summary-judgment briefing.

[8] Plaintiff contends Farmer Brown, which argued Turner's declaration was inadmissible first in its response brief on appeal, forfeited any argument regarding the declaration's admissibility because it did not object to it as summary-judgment evidence below. But Turner did not die until December 28, 2023, more than three years after Farmer Brown moved for summary judgment and Turner sought to defeat it with his declaration. Turner also made his declaration to defeat summary judgment, and "[a]t the summary judgment stage, evidence need not be submitted 'in

Now Turner is not available to testify and no hearsay exception applies to Turner's declaration. Federal Rule of Evidence 804(b)(1) only allows courts to admit former testimony from an unavailable witness for the testimony's truth if it "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one" and "is now offered against a party who had— or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Turner gave his declaration in response to Farmer Brown's summary-judgment motion, and therefore did not reveal its contents during "a trial, hearing, or lawful deposition." And Farmer Brown had no opportunity to develop it by cross-examination because the case never made it to trial.

Ultimately, we consider only evidence that could be admissible at trial when reviewing the propriety of a district court's order granting summary judgment.[9]

_____

a form that would be admissible at trial.'" Argo v. Blue Cross & Blue Shield of Kansas, Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting Celotex Corp., 477 U.S. at 324). Farmer Brown had no need, therefore, to object to Turner's declaration's admissibility because it could have cross-examined Turner at trial. Farmer Brown did not forfeit its admissibility argument because it was not clear below that Turner's testimony about his interactions with it would be inadmissible because of his death.

[9] To be clear, evidence need not be in admissible form for courts to consider it for summary judgment. Argo, 452 F.3d at 1199 (quoting Celotex, 477 U.S. at 324). Parties often "submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." Id. (citing Bryant, 432 F.3d at 1122). But as explained above, Farmer Brown has no way to cross-examine Turner at trial and no hearsay exception applies. For that reason, Turner's declaration is inadmissible and, at this point, not proper summary-judgment evidence.

Johnson v. Weld Cnty., Colo., 594 F.3d 1202, 1209 (10th Cir. 2010) (quoting

Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1268 (10th Cir. 1998)).

So even assuming the declaration could demonstrate his position by clear and

convincing evidence, excluding Turner's declaration extinguishes Plaintiff's case

because he relied almost entirely on his own testimony, as set forth in the declaration,

to rebut Farmer Brown's strongly contradictory record evidence.  Thus, we lack

sufficient evidence upon which we could reverse the district court's summary-

judgment holding, and Plaintiff's reformation-claim appeal must fail as a matter of

law.

### B.

Plaintiff next argues the district court erred in granting summary judgment on

his contract-breach claims against MetLife.  He has three: one based on failing to pay

the full replacement-coverage balance he would get if he succeeded in reforming the

contract to remove the $100,000 limit, one based on alleged failure to properly

calculate and pay his business-interruption-loss coverage, and one that generically

seeks damages for failure to pay "other coverages" MetLife allegedly owed under the

insurance policy.  As the district court correctly granted MetLife summary judgment

on Plaintiff's reformation claim, the first cannot succeed.

As for the business-loss claim, Plaintiff contends MetLife vastly

underestimated his business-interruption loss.  MetLife gave him $2,319.30 in

business-interruption-loss coverage, calculating that amount by referencing profit and

16

loss statements Plaintiff provided.[10]  Plaintiff argues that in so doing it "ignored the seasonal aspect of [his] restoration business" and "used months where Mr. Turner was not as active to calculate lost income, instead of the months that would be sharply affected by the lost business."  Instead, it should have used "the average of the whole year" and reached the far-higher total of $236,216.61.  In other words, he argues MetLife underpaid his business income expenses based on incomplete data.

These arguments fail.  Plaintiff's factual theory both in his response to MetLife's summary-judgment motion below and in his appellate brief turn on improper calculation, namely a seasonal aspect to his HVAC business that undervalued the true amount lost.  But his amended complaint alleged no facts to support this argument.  His complaint instead says only that the "policy further provided coverage for business interruption resulting in a loss of business income," and that he was "entitled to benefits under this coverage but Metlife has failed and refused to tender such benefits."  When alleging his contract-breach claim, meanwhile, he said only that he "requested Metlife tender payment under [the business-income-loss] policy and Metlife has failed to fully tender said payment in connection with said policy."  The reference to having "failed to fully tender" the

---

[10] The relevant provision in Plaintiff's insurance policy covered loss of business income if the loss was "due to" the suspension of operations "caused by direct physical loss of or damage to" covered property.  Plaintiff gave MetLife his profit and loss statements to show business interruption, from which MetLife calculated that during the relevant period Plaintiff's projected revenue was $120,956.13.  Subtracting Plaintiff's reported actual revenue of $116,081.99 and $2,554.84 of discontinuing expenses, it paid $2,319.30 in business income loss coverage.

business income indicates that, contrary to MetLife's argument, he alleged MetLife underpaid his business income loss coverage. But no facts, let alone a factual theory, supported that bare legal conclusion.[11]

Plaintiff cannot allege new factual theories on appeal. Generally, "we will not consider arguments on appeal not tied to the allegations in the complaint." Requena v. Roberts, 893 F.3d 1195, 1205 (10th Cir. 2018). Although parties can refer to facts only found in discovery to show material factual disputes sufficient to preclude summary judgment, due process and notice-pleading principles require they not "alter[] radically the factual basis of [their] complaint at summary judgment" by "introduc[ing] a new factual basis not previously presented in the pleadings for a claim." Whitaker v. Milwaukee Cnty., 772 F.3d 802, 808 (7th Cir. 2014). Holding otherwise would "permit plaintiff[s] to construe [their] complaint as entirely generic and, throughout the litigation, incorporate any new factual allegations without seeking amendment[, which] would read the 'fair notice' requirement out of Rule 8(a) and would seriously undermine the rule's goal of encouraging expeditious resolution of disputes." Pickern v. Pier 1 Imports (U.S.), Inc., 339 F. Supp. 2d 1081, 1088 (E.D. Cal. 2004), aff'd, 457 F.3d 963 (9th Cir. 2006); see also Roeder v. Normandy Apartments Holdings, LLC, No. 14-CV-494-JHP-PJC, 2015 WL 5673127

---

[11] Contrary to the district court's holding, Plaintiff cited to record facts that supported his argument below, albeit only in his response to MetLife's renewed motion for summary judgment's facts section. But he neither raised this argument nor alleged facts to support it in his amended complaint, and we do not consider such arguments and factual theories. Requena, 893 F.3d at 1205.

at *2 (N.D. Okla. Sept. 25, 2015) (refusing to consider a new factual theory not mentioned in the complaint raised in summary-judgment response because "[t]o do otherwise would reward Plaintiff's prolonged delay in revealing his true theory of liability and would be unfairly prejudicial to Defendants").  Plaintiff did not simply change the factual basis for his claim, he never alleged one at all in his complaint. He cannot now rely on facts gained from discovery to create a material factual dispute.

Even if Plaintiff had alleged facts to support his undercalculation theory, he would still lose.  Plaintiff's insurance policy required him to send MetLife "a signed, sworn proof of loss containing the information . . . to investigate the claim . . . . within 60 days after [MetLife's] request."  The record reveals MetLife's adjuster Sedgwick asked Plaintiff for records supporting his alleged business loss on February 17, 2017, and again on March 15, 2017.  Plaintiff provided the relevant records only on December 14, well after the sixty-day deadline.  So even if Plaintiff is correct that MetLife undercalculated, his failure to timely submit the required records suggests the contract did not even entitle him to the business-interruption coverage he received.

Plaintiff's third contract breach claim fails as well.  He claims the district court erred in holding he did not adequately plead contract breach based upon coverages other than reformation-driven full-replacement coverage and business-interruption-loss coverage.  He argues he pled his "policy provided for various coverages" under the heading "COUNT 3 - BREACH OF CONTRACT AGAINST METLIFE," and

that he alleged broadly under the bad-faith count that MetLife "[f]ail[ed] to pay [him] the insurance benefits that it was entitled to under the policy." Ignoring this claim merely because he did not place these relevant allegations under the contract breach heading, Plaintiff contends, violates the "liberalized pleading standard under Fed. R. Civ. P. 8 and [requires] a specificity in pleading that Rule 8 does not require."

But liberal pleading standards do not lend a voice to utter silence. Merely observing that the complaint referenced "various coverages" does not provide MetLife any notice that it either underpaid or did not pay Plaintiff the other coverages it owed him under the policy in breach of the policy. And nothing in the complaint's contract-breach section suggests that claim implicated those other coverages. It alleged exclusively that Plaintiff "had a policy of insurance with Metlife to cover losses to its building and business" for which "Metlife has failed to fully tender said payment in connection with said policy." No reasonable litigant would interpret this language to state a general contract-breach claim for failure to pay under other policy coverages of which Plaintiff omitted mention. Even if we ignored the contract-breach heading and looked to Plaintiff's bad-faith count, Plaintiff again omitted any identifiable references to other coverages.[12] We hold

---

[12] He alleged only that "[f]ailing to pay Plaintiff the insurance benefits that it was entitled to under the policy at the time when Defendants knew the Plaintiff was entitled to those benefits" evidenced bad faith, which any reasonable litigant would have understood to mean the replacement coverage and business-loss coverage he described previously.

Plaintiff to that omission. The district court properly granted MetLife summary judgment on this claim.

C.

Plaintiff claims penultimately that the district court erred in dismissing his bad-faith claim against MetLife.  As with his contract-breach claim, his bad-faith claim has three iterations: failure to pay the required full-replacement coverage under the reformed contract, failure to pay the policy's other coverages, and failure to pay the full business-loss coverages.  For the reasons explained above, the district court correctly refused to reform the contract and Plaintiff's amended complaint did not adequately reference any other coverages.  The first two bad-faith claims therefore fail.

As to Plaintiff's last claim, he largely repeats his contract-breach arguments. He restates that he "presented evidence that MetLife's accountant severely undercalculated the business losses," and that "[t]he District Court ignored this evidence and merely stated MetLife fully paid [Plaintiff's] claim within days of receiving word that MetLife should base its decision on the business records submitted by [Plaintiff] and/or his adjuster."  The district court, he contends, thus inappropriately weighed evidence during summary judgment.

The district court did no such thing.  Plaintiff fails to raise a genuine factual question for his bad-faith-business-loss claim because, as with his contract-breach claim on the same policy provision, he did not allege any facts in his complaint related to his miscalculation theory.  Pointing to record facts obtained during

discovery that support this theory cannot raise a genuine factual issue for the same reasons.  See Whitaker, 772 F.3d at 808.

And the district court did not weigh evidence.  It instead noted that undisputed record evidence "show[ed] that [MetLife] requested several financial documents from Plaintiff's adjuster so that the [business-loss] claim could be evaluated" but that Plaintiff refused to provide them.  It further noted that Plaintiff only argued that "Defendant's adjuster admitted that undisputed payments were unreasonably delayed, in some instances for many months after she had reason to know those claims were valid," and that he had "produced evidence that Defendant withheld payments on other claims without conducting a reasonable investigation."  Because this argument was "vague and not supported by the undisputed facts pertaining to this claim," the district court correctly declined to find any material factual dispute about whether MetLife failed to timely pay Plaintiff his proper business-loss coverage amount.

### D.

Lastly, Plaintiff argues the district court failed to recognize a fraud claim in his amended complaint against Farmer Brown.  His amended complaint never used the word fraud, and the relevant heading reads "COUNT 1- NEGLIGENCE AGAINST FARMER BROWN."  Plaintiff contends, nevertheless, that, though he "may have titled his claims against Defendant Farmer Brown as 'negligence[,]'" his claim "is—and has always been—one for fraud based on the misrepresentations of [Farmer Brown's agent]."  In Plaintiff's view, the district court ignored various factual allegations and "applied a formality in pleading standard that simply does not exist."

22

He points to several facts that could support a fraud claim, especially some purported misrepresentations by Farmer Brown's agent upon which he allegedly relied in detrimental belief that he had full-replacement coverage. Thus, he contends, "[t]hese allegations all point to a substantive fraud claim against Defendant Farmer Brown and the facts obtained in discovery back that up."

Plaintiff's after-the-fact interpretation of his complaint is unpersuasive. Under Oklahoma law, plaintiffs must state fraud claims "with sufficient particularity to enable the opposing party to prepare his/her responsive pleadings and defenses." A-Plus Janitorial & Carpet Cleaning v. Employers' Workers' Comp. Ass'n, 936 P.2d 916, 930–31 (Okla. 1997) (citing Gay v. Akin, 766 P.2d 985, 993 (Okla. 1988)). Though that "does not mean the plaintiff has to plead detailed evidentiary matters," nothing in Plaintiff's amended complaint suggests he intended to bring a fraud claim against Farmer Brown. Fanning v. Brown, 85 P.3d 841, 848 n.10 (Okla. 2004) (citing A-Plus Janitorial, 936 P.2d at 930–31). Besides the heading labeling count one as a negligence claim, the allegations included statements such as "Farmer Brown had a duty to Plaintiff to exercise reasonable care" and "Farmer Brown breached that duty by advising Plaintiff he had purchased a policy of insurance that contained replacement cost coverage without obtaining such policy or confirming that the policy did, in fact, contain replacement cost coverage." Both reference negligence elements and standards of care, suggesting Plaintiff originally intended to bring a negligence claim—he only later attempted to describe his claim as one for fraud, even though the complaint is devoid of allegations supporting that theory.

23

Smith v. City of Stillwater, 328 P.3d 1192, 1200 (Okla. 2014) ("There are three elements to a claim for negligence: 1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care.") (citing Berman v. Laboratory Corp. of Am., 268 P.3d 68 (Okla. 2011)).

In this circuit, "[w]e do not believe [] liberalized pleading rules permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case" by using a "late shift in the thrust of their case" to potentially prejudice the opposing party. Evans v. McDonald's Corp., 936 F.2d 1087, 1091 (10th Cir. 1991) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1219 at 194 (1990)). Here, Plaintiff attempted to switch theories against Farmer Brown two years after the case began while responding to its motion for summary judgment.[13] That is, by any standard, too late to shift the thrust of one's case, and clearly prejudices Farmer Brown in its attempt to

---

[13] As Plaintiff filed this case on November 15, 2018, this number comes from Plaintiff's November 16, 2020, response to Farmer Brown's motion to dismiss. Plaintiff's response suggests he may have first made the argument in his reply to now-settled defendant Sedgwick's response to his motion to supplement the summary-judgment record on October 22, 2020. But Farmer Brown had no reason to read that document, which did not implicate any claims against it. And prior references to fraud related to his claims against MetLife would not reasonably put Farmer Brown on notice that Plaintiff's claims against it also implicated fraud. Even if they did, Plaintiff first expanded upon that argument on April 3, 2020, at least a year and a half after he amended his complaint.

build a coherent summary-judgment motion.[14]  Plaintiff cannot survive summary judgment by claiming fraud.  Because he abandoned his negligence claim both below and on appeal in favor of fraud, we do not consider whether he could succeed on that theory.  Wyo-Ben Inc. v. Haaland, 63 F.4th 857, 870–71 (10th Cir. 2023) (citing Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1127 (10th Cir. 2011)).

E.

Plaintiff argues the district court should have permitted him to fix all these flaws by amending his complaint.  The district court denied the motion because the case "had been proceeding for years and discovery was closed."[15]  Referencing the well-known precept that "[r]efusal of a request to amend is appropriate only 'on a

---

[14] In addition to arguing that his pleadings encompassed fraud against Farmer Brown, he also argues that "Farmer Brown was on notice of Plaintiff's legal theory throughout the discovery phase of this case, and certainly by the time the parties started taking depositions."  But Plaintiff cites nothing indicating this is true.  Farmer Brown's summary-judgment motion did not even mention fraud, casting further doubt upon Plaintiff's claims.

[15] The district court also denied leave because "Plaintiff could have sought leave to amend at the time he filed his response by filing a motion and failed to do so."  Plaintiff contends the district court should have perceived his response to Farmer Brown's and MetLife's summary-judgment motions as a request to amend his complaint to the extent he presented new factual theories and allegations, and that its failure to do so and allow amendment violates the Federal Rules of Civil Procedure's policy that "courts should 'freely' allow amendment of the pleadings."  Plaintiff is correct that "[o]ur cases interpret the inclusion of new allegations in a response to a motion for summary judgment, as a potential request to amend the complaint."  Adams v. C3 Pipeline Constr. Inc., 30 F.4th 943, 971 (10th Cir. 2021) (quoting Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003)).  But his expansive view of these cases would render pleading requirements and litigation deadlines meaningless.  But, even assuming he is correct, the district court gave other reasons for denying amendment, so this error, if any, is harmless.

25

showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment,'" Plaintiff argues that "delay alone is an insufficient ground to deny leave to amend" even though he waited several years to move to do so.  He compares his case to Minter v. Prime Equip. Co., 451 F.3d 1196, 1205 (10th Cir. 2006), in which we held that a plaintiff's belief that he already fairly pled his claim excused his delay in seeking amendment.

Minter illustrates precisely why the district court did not abuse its discretion in denying Plaintiff's request to amend.  First, although "[l]ateness does not of itself justify the denial of the amendment," Minter, 451 F.3d at 1205 (quoting R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir. 1975)), the law is clear that "[t]he longer the delay, 'the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend,'" id. (quoting Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)).  Here, Plaintiff had already amended his complaint once when he sought leave to amend again on November 16, 2020, more than two years after litigation commenced.  The timing and previous amendment weigh against granting further alteration.

Plaintiff also presents a weak justification for the delay.  We focus on "the reasons for the delay," id. at 1206, when ruling on amendment motions.  We generally uphold the denial of leave "when the party filing the motion has no adequate explanation for the delay," Frank v. U.S. West, 3 F.3d 1357, 1365–66 (10th

26

Cir. 1993) (quoting Woolsey v. Marion Lab'ys, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991)), and when the plaintiff tries "to 'salvage a lost case by untimely suggestion of new theories of recovery,'" Minter, 451 F.3d at 1206 (quoting Hayes v. Whitman, 264 F.3d 1017, 1027 (10th Cir. 2001)).  Plaintiff's only proffered reasons for why he did not move to amend earlier are that he believed his claims were already fairly pled, and that "the claims arose from the same facts and circumstances" the complaint expressed.  As explained above, Plaintiff's proposed amendments took his case far afield from the bare factual allegations his complaint expressed.  His long delay in seeking amendment and threadbare justifications for it strongly suggest he sought amendment to "salvage a lost case," which is a justification we generally find unpersuasive.  The district court did not abuse its discretion in denying amendment.

AFFIRMED.

Entered for the Court

Joel M. Carson III
Circuit Judge

27